Is that your iPad? It is. Okay, I was just making sure they didn't leave it there on the table. That's yours, all right. That's my crutch. All right. Well, I try to use those crutches, too, but I'm probably not as good at it as you. Oh, I'm of your generation, Your Honor, I assure you. Anything like that, I have to go to a teenager for assistance with. Your Honors, obviously the threshold issue here, and it's a very important one, is the question of whether there's EDFA deference in this case or whether this case court will review the certified question before de novo, as if it came up directly from a federal appeal. And we submit that because the California Supreme Court cited three procedural default cases and said nothing more in its August order than this is a procedural default ruling. Counsel, was the California Supreme Court's judgment an appeal from a lower court in California? No, it was an original writ. It was an original writ. Right. Right. And what did those cases say? What those cases say, in 1998, before the ---- My recollection of those cases is that all of those cases say quite a bit about a number of different things. That's right. They're all procedural default cases. But, for instance, with a case like Clark, which was one of the cases cited, it has any number of potential procedural defaults. There's no pinpoint site in this case. It's generally ---- it can be dealing with timeliness. The United States Supreme Court in Walker v. Martin said if you pair a Clark citation with a Robbins citation, a 1998 decision, then you know it's about timeliness. But as the magistrate pointed out in this case, without a pinpoint citation, without a Robbins citation, you don't actually know. You know that Clark is a procedural default ruling, but you don't know what it is. And, most importantly, you don't know whether it applies. But the Supreme Court didn't cite Robbins. That's right. That's right. And it did cite two other cases. That's right. So what should we learn from those cases? Well, Robbins makes it clear. Waltrius is a default if something has been raised already on appeal. That means it's been here and been decided. It's been somewhere and been decided. Miller is it's been decided on a writ rather than on a direct appeal. And then Clark has many things in it, including timeliness. Right. But with the citation to Waltrius there, doesn't that mean and isn't it logical, given the history of this case, that what the California Supreme Court said was been there, done that? In other words, you've raised issues that have been previously decided by California courts on habeas. Right. And here's why the magistrate was correct in saying that because this is ambiguous, it cannot provoke ed per review. We don't know whether the Waltrius cite applies to the certified claim. The writ before the court in 2000 had something like 75 claims before it. And if Waltrius had been applied to the certified claim, this court would find it was not an adequate and independent state ground because the certified claim was never raised on appeal. However, it seems to me that your biggest point in this is the Penn decision. And it seems to me that in the Penn decision there was no question they were asking review of the prior decisions. In this particular matter, Hunt didn't ask review for any prior decisions. He only filed another habeas review. Right. And I'm from Idaho, so I guess I can get away with saying this. It seems to me that the California way to deal with habeas is a very confusing system. Right. You can start in the lower court and appeal. Right. Or you can skip them all and start with the best court and take your original habeas, right? Right. And so what happened here was he started in the highest court, took an original petition, and now you're suggesting, even though he didn't ask for a review of the other decisions, simply because one or two cases, and I'm not sure I agree with you, but your rationale for one or two cases would suggest, then, its jurisdiction or its stripping of the other authority of the cases. Isn't that your argument? Your Honor, in 1998 in Robbins, in footnote 34, because there had been this confusion, the California Supreme Court said, okay, look, here's the deal. Waltrius means this. Miller means this. Clark means this. They said, we can, if we choose, also not only procedurally default you, but add the words and we deny it on the merits. They went on to say, if we cite those three cases, it's procedural. If we don't cite those three cases, it's on the merits. So there's just no way to read these three procedural. They're all, admittedly, they're all procedural default cases. There's no way to read them as suggesting that they're anything other than procedural default cases, as opposed to adopting some case on the merits. Is that a pretty important distinction to make? Or if we give deference to the California Court of Appeal decision, do you lose? Well, here's the thing, Your Honor. The other thing that is true, as the court claim here, and let me make this clear, the court claim here is going to be that an attorney, and I'll use the prosecutor's word at trial, did something unheard of. He announced to the judge that he would not interview any defense alibi witness and he would not ask them any question that wasn't first provided him by the prosecution. And the prosecutor gets up in closing and he says it, it's not me. So this is unheard of. Wait a minute. You didn't answer my question. My question was simple. If I don't agree with you that the 2000 California Supreme Court decision strips these other decisions of any authority and I give deference then to those decisions, do you lose? No. Why? That's where you ought to go now. You've only 357 to go. Because there is no California Supreme Court, even if you got past the procedural default, no California Supreme Court lower court ever addressed this conflict decision. If you look at the 1998 decision of the Court of Appeal denying a writ, it makes no reference to the facts of it and simply says we're going to decide IAC cases by Strickland standards. So there's nothing to defer to. There's nothing to defer to. There is no reason, decision of this conflict claim, which is the reason for my prelude, Your Honor, that the notion that an attorney stood up, told the judge that he would be ineffective by never interviewing defense witnesses, and the prosecutor gets up and says, you know, Counsel, I want to make sure I'm very clear here. As I understand the nature of your IAC claim, you've made two different claims, two different ways of approaching this. One is that Mr. Barron's had a conflict and the second is that he just simply was ineffective. Okay? Now, as to the second one, it clearly has been addressed by California courts. Well, various parts of it were addressed specifically. Right. And in that case, and if that case, based on Judge Smith's presumption, that is, if he disagrees with you on the nature of the California Supreme Court, then we would have to give that pedeference at least to the question of whether there was ineffective assistance in failing to interview people, perhaps not on the conflict question. Fair enough. But in ten minutes I'm going to go to the court of it, and that's why. I mean, Judge Bybee has stolen my questions because I'm really trying to figure out what you're really saying. If you're going to the prejudice issue, the conflict, if you will, between the two, California didn't deal with that, did they? I hope this answers your question, Your Honor. What we are saying here is that there was no decision, there's a procedural default, there's no substantive merits decision in the lower courts of the claim that because Barrons was accused of criminality or potential criminality, he completely, because of that personal conflict, did not perform the defense. And so in that instance we would exercise what review? Because that claim was both procedurally defaulted and there's nothing to defer to, you decided de novo under Manholt, this Court's decision in Manholt, and this Court's decision in Manholt says that if you're accused of a crime related to anything dealing with your client, you must disqualify yourself. And because the attorney in that case did not, they said the adverse effect of that was that he did not competently present evidence or cross-examine, which is precisely the situation here. But even under Strickland, Your Honor, I would say this. If you were to decide that under a Strickland standard, that obvious deficiency, because he says to the court, I'm not going to do anything that a lawyer would do, and the prosecutor says it's unheard of, the prosecutor gets up and says, that is proof of guilt. The way that this lawyer deficiently presented this evidence is proof of guilt. How can that not undermine the confidence in the verdict when two things are true? The prosecutor knows that's not true because he knows the reason that Barron's was doing this. He announced it to the court, was the Titus allegation. And the defense can't get up and object to this false argument because what's it going to do? Get up and say, that's not true. It's not that my client is guilty. It's that I'm trying to protect myself from potential prosecution on a claim that I was going to suborn perjury. Counsel, is the Titus allegation, is that your best argument? Is that your strongest argument? It is definitely our lead argument, that the Titus allegation. I read the Titus testimony this morning. I have to be honest with you, it wasn't very impressive. Your Honor, it is not the ‑‑ it's not how powerful it is. It's that this Barron's admits to the court, he uses the word Titus, and we've cited it in our brief. He's saying, I want you to know, I'm not going to examine any, interview any of these witnesses. You know about the Titus thing. We've cited that in this argument. And so he viewed it as something that was so threatening to him that he had to forego interviewing defense witnesses, exculpatory defense witnesses, and examining them on the basis only of a memo from a prosecutor. And so can you explain the theory of conflict here succinctly to me? Yes, Your Honor. I think I understand it, but I'd like to hear it from you very succinctly. And let me ‑‑ I'm going to very succinctly attempt to summarize 27 to 37 of our opening brief. It is this. Titus says this guy is going to go manufacture alibi witnesses. Barron's gets up in front of the court and says, Your Honor, I want you to know, I'm not going to interview any of these witnesses. And I am ‑‑ when a witness, a particular witness gets up here, I am only going to ask her questions that track the prosecution's memo on this. I will not interview her. I will not ask a question outside the scope of it. And the reason for that is ‑‑ This was in the context of the Tucson students. Right. Yes, yes. And the reason for that is I want you to be assured that I'm not doing anything that I've been accused of here. But how could that have even been a plausible possibility? Since Barron's didn't come up with them, it was the prosecutor who said, We've got to tell you, we've heard from these students in Tucson and we've interviewed them. Barron's didn't know anything about it. How could that possibly have implicated a conflict in Barron's? Well, Barron's may be an idiot, but the fact is he articulated that it was a conflict. And because he did, you saw the prosecutor in closing said, Did you see a word of that, any investigation? Not one finger was lifted. Not only that, they made a big point in saying they didn't even talk to these people until March 7th time. That is unheard of. And then he goes on to say that what ‑‑ did they lift one figure? No. And what that ‑‑ I'm going to put in big letter, red letters on the bottom of this chart, what this means. Joe Hunt's consciousness of guilt. That's what it means. The next day he goes back to the big red letters argument in closing. So Barron's may be a fool. He may be an idiot. But nonetheless, he tells the court, I am forsaking the critical defense function of preparing witnesses. And I am doing that. And he says it's Titus related. He therefore examines the defense witnesses in a way that allows the prosecutor to say this is unheard of. It's unheard of. And there's only one explanation of it. Joe Hunt's guilt, when we know the explanation for it, as given to the court, was the Titus allegation. Your Honors, I submit to you that it meets the standard of adverse effect under Keiler and Manholt. But, Your Honor, I would submit to you that it is ‑‑ it obviously fits the standard of undermining confidence in the verdict. And I believe it's de novo review. But even if you were to defer to state court findings, rulings, you will find nothing in the state court that addresses the Titus complex of facts. I'd ask to ‑‑ I want to answer any other questions. Otherwise, I'd ask for at least a minute or so to respond. I'll be happy to give you a minute to respond. No, I haven't any questions. Okay. Thank you, Mr. Reardon. I think I understood better what he was saying now. Good morning, Your Honors. May it please the Court. Elaine Timonis, Deputy Attorney General for Respondent. I'm going to start with the specifics and then move on to the general in response to my opponent's argument. The defense team did interview Cancella and Lopez. They went to Arizona to interview them. Barron's interviewed them before they testified. They had to get a subpoena to get Cancella into L.A. to testify because she had become reluctant to do so. Barron's did his job. The defense team did its job. And what matters at the end of the day is not what defense counsel might have been thinking, but what did he do? What was his performance in the case? And as far as the Arizona witnesses are concerned, Barron's performed like a constitutionally effective attorney. Regarding the standard of review, review is deferential under ADEPA here because for several reasons. One is that a higher court's decision under California's rather unique habeas scheme is an original jurisdiction. Each level of court has original jurisdiction. So a higher court's habeas ruling does not nullify, eviscerate, or otherwise change a lower court's habeas ruling. In this case, and so it's possible to look past that to see what the state courts did and to defer to any lower state court merits ruling, which existed in this case on petitioner's claims. The cases cited by the California Supreme Court, the district court found that decision to be ambiguous and unexplained and so could look through it because the court couldn't tell which claim the case citations applied to. But if those citations do anything at all, it's to leave intact the lower state court's merits rulings. Waltria says you don't get to renew a claim on habeas that was previously raised and rejected on appeal. Miller says that a habeas petition is being rejected for the same reasons that it was rejected earlier. And Clark, without a pinpoint citation, even the district court said you can't tell what it's being cited for, and it could have been cited to bolster the citations to Waltrias and Miller. So, Ed. But what counsel argues is the fact that Clark was cited and the fact that there isn't a pin cite and the fact that Clark is cited and it's a little bit different than either Waltrias or Miller, that that would make it all ambiguous and therefore we ought to have to no-vote review. That's his argument. Right. And I think the problem with that argument and the problem with even some of the cases that are cited that Petitioner cites in his reply brief, which are unreported district court cases, some of this, some of these cases kind of, and Petitioner in particular here, confusingly conflates the analysis of whether a case and a claim has been exhausted or procedurally barred on the one hand with the question of what deference is due to the state court decisions on the merits on the other hand. And the deference issue clearly isn't confined to the highest state court decision. It's the last reasoned decision. Well, it's whatever the state court's merits rulings have been. And often the language that's used to discuss that is YILST's last reasoned decision language. But I think it's helpful to remember that YILST was a pre-EDPA case, excuse me, pre-EDPA case and didn't directly address and couldn't have anticipated addressing what deference is due to a particular state court decision under 2254, 2254D. And there's no question in this case, this was an original second habeas in the Supreme Court. Right. Were there any, were there any claims that have been discussed here today that were raised for the first time before the California Supreme Court, not been raised below? How about the conflict claim? The district court found that all of the claims addressed here had been exhausted, either in this, had been raised either in this petition or in previous petitions. But as to all of them, it found some state court merits ruling, ruling below. And so it's our position that deference should be applied to those lower state court decisions. The only, there were a couple of. And even the conflict? The conflict claim was raised in Petitioner's March 29, 1996 supplemental petition, filed on the first day that the evidentiary hearing in state court began. And those claims were addressed on their merits by the California Court of Appeal, summarily denied with a statement that no prejudice resulted. And the district court looked to that decision as, you know, to which it was able to give deference. It's true that the Court of Appeal decision didn't go into detail about that claim, but it was raised. And, you know, these claims in a habeas case like this, they tend to morph over time. So there was a different conflict claim raised below on different grounds that, you know, isn't a subject of this appeal. But the district court was pretty clear that a couple of other claims not at issue here had not been addressed on the merits in the state courts, and it gave de novo review to those claims. The rest of them, it gave deferential review under AEDPA. Under any standard, however, it's our position that Petitioner's ineffective assistance claims have to fail. They have to be evaluated in light of the overwhelming evidence against Petitioner presented at trial, his multiple confessions to multiple people, the handwritten to-do list he left behind at the apartment when Levin was killed, his co-defendant Pittman's impersonating Levin the day after the murder, flying to New York using Levin's name and stolen credit card, Petitioner's appearance early the next morning after Levin was killed in possession of Levin's signed million-and-a-half-dollar check-in contract, and more. In light of that evidence, Petitioner's ineffective assistance claims, his claims that counsel should have done something differently or better, have no merit. All of the evidence that he contends should have been investigated or presented at trial was vetted in a very thorough 13-day evidentiary hearing at which 30 witnesses testified, 19 of them called by Petitioner. The state court made factual and credibility findings that are binding in this court under any standard of review and found that... The California Court of Appeal remanded to have the hearing. Right. On direct appeal, the Court of Appeal remanded it to the Superior Court for an evidentiary hearing, and that's the hearing I'm referencing. Okay. I just wanted to make sure I have the right hearing. Yeah. And the court found that the witnesses' defense counsel claims should have been called were either not credible, some of them utterly so. Their testimony would have been inconsistent with a defense theory that Levin had masterminded his own disappearance to escape his criminal prosecution and financial and legal troubles. That defense counsel didn't have information or wasn't on notice sufficient to warrant the defense to have investigated these people. They came forward too late to testify in the guilt phase or even in the penalty phase or at trial at all. And or their testimony would have been cumulative. So all of those findings the Superior Court made demonstrated that counsel had not been... Had acted properly. And, you know, there are countless ways to try a case, and even attorneys of the highest caliber, no two attorneys will try a case the same way. But here defense counsel made reasonable tactical and strategic decisions to present evidence consistent with the defense that Levin had masterminded his disappearance, evidence that defense counsel found credible, and they explicitly found... Barron's testified that he thought Cancella and Lopez were credible and that he didn't want to present non-credible so-called citing witnesses that could have undermined those more favorable witnesses. And he made decisions to stay away from evidence that would have been inconsistent with that theory or wasn't wouldn't have been credible at all. The citing witnesses claimed to have seen Levin out and about in West L.A., where generally the part which is generally the part of town where Levin had lived and where the trial was taking place, that they had seen him out and about before or during the trial, which would have been inconsistent with the defense theory that he had fled or disappeared. And Cancella and Lopez, the Arizona witnesses' testimony that they saw him in Arizona was consistent with the testimony that he had left town. I was going to say, it seems to me at least the Arizona testimony is consistent. That's right. That's right. But we're really there. Your argument is that as to those, they were interviewed and he made a tactical decision not to call them. That's right. And some of them came forward, as I said, very late in the game as well. Robinson, for instance, came forward after when the jury was already deliberating. And he actually came to court on April 20 while the jury was in deliberations. He had contacted the district attorney. And in court, the district attorney explained that they'd given him a polygraph, which he'd failed. He'd lied to the D.A. about when he claimed not to have known anything about the Levin trial, even though he was a journalist, when he supposedly saw Levin in Westwood while he was waiting for a movie showing six months earlier. I mean, he wasn't credible. And Barron's had a good basis for deciding not to present his testimony. Anything further, Counsel? Thanks. I just want to add that every court, every state court and the federal court that has heard these claims and heard this evidence has decided that Levin is dead, that Petitioner killed him. And as the California Court of Appeals said, none of the collateral notions raised in Petitioner's habeas petitions can change that immutable reality. Thank you, Counsel. Mr. Reardon, I'll give you a minute. Three very brief points. I want to be procedurally clear. The conflict claim was never presented, and the magistrate found this, to the California Supreme Court until the 2000 petition, which was denied. Now, wait a minute. Was it presented to any other California court? What about what Counsel just said? Yes. It was presented to the California Court of Appeal in a supplemental petition, and I direct you to page ER, Volume 2, ER 272. They talk about Strickland. There is no mention of conflict. There is no mention of Kyler. There is no mention of Titus. There is no mention of Barron. So I'm saying, Your Honor, there is no merits ruling on the conflict claim to defer to, even if you could look past the three. Well, that's very different from saying the conflict claim was never presented to the California Supreme Court. It was raised. I hope I'm clear, Your Honor. It was not presented to the California Supreme Court until the 2000 petition. What difference does it make whether it was raised to the California Supreme Court, as long as it was raised to some California court for which there was a final judgment? It makes all the difference in the world, of course, if this Court respects the procedural default rulings of the California Supreme Court. That's their only ruling on it. They could have done it on the merits. They only did it on procedural grounds. And I would submit that there is – But they could have done it, at least with Waltrius. They could have done it on the grounds that had been previously decided and not appealed. Right. But it – no, no. Waltrius applies to direct appeals. So if Waltrius was the holding there, that would be inadequate because that would be false. Miller is the one that would say it was – I was going to say, what about Miller? Okay. Miller. Right. Miller – I mean, Waltrius, I get your point, and you're very good. And so, therefore, I'm glad you got there. But Miller is definitely against you. Right. But there is no – the magistrate's ruling, and it is very clear that there's a lot of you'd have to overrule is that if it's ambiguous, and any one of – you would have to prove that all three of these are valid as to the certified claim because we don't know without a specification as to what subclaim these apply to, what the California Supreme Court's procedural ruling was. We know it's procedural, but we can't determine that it was – what it was and how it applied to this. Very quickly, on page 32, Mr. Barron says – I'm sorry, page 32 of what? I'm sorry, of my opening – our opening brief. He says he's going to be very sanitary with the witness, and he mentions the Titus allegation as being the reason. On page 30, he says, What I have done, Your Honor, I have not even made up my own questions. And this is as to the Arizona witness. I have used the prosecutor's questions and other police's questions, and I am mimicking and reading these questions from the tape. That is what the prosecutor correctly says is unheard of. What defense attorney relies solely on a prosecutor's memo to present a critical defense witness? And then we get to the question. That's an adverse effect. But when you get to prejudice and the prosecutor stands up and says, That is consciousness of guilt on Hunt's part. How doesn't that undermine confidence of the verdict when we know that was not the reason that the examination was conducted in that way? Thank you very much, Your Honor. Thank you. Thank both counsel for the argument. Hunt v. Virga is ordered submitted.
judges: Bybee, N.R. Smith, Stein